IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AQUA ACCEPTANCE, LLC<br><br>**Plaintiff,**<br><br>v.<br><br>THE PELICAN GROUP CONSULTING, INC., et al.<br><br>**Defendants.** | Civil No. 1:20-cv-02802-JRR |

**MEMORANDUM OPINION**

Pending before the court is Plaintiff Aqua Acceptance LLC's ("Aqua") Motion for Reconsideration (ECF No. 77; the "Motion"), as well as all opposition and reply papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons that follow, by accompanying order, the Motion will be denied.

**I.     BACKGROUND**

On December 9, 2020, Plaintiff filed its First Amended Complaint (ECF No. 16; "Complaint") containing six counts: (1) Money Judgment against the Pelican Group; (2) Breach of Contract/Breach of Representation and Warranties against the Pelican Group and Mr. Ferguson; (3) Fraud/Civil Conspiracy/Aiding and Abetting against the Pelican Group Defendants[1] and University of Mary; (4) The Alter Ego Defendants; (5) Fraudulent Transfer against Messrs. Ferguson, O'Meara, and Whelan; and (6) Fraudulent Transfer against University of Mary, and Messrs. O'Meara, Ferguson, and Whelan. (ECF No. 16.)

---

[1] Frank Ferguson, The Pelican Group Capital Advisors, LLC, The Pelican Group Consulting, Inc., The Pelican Group Mission Advancement Services, LLC, the Pelican Group, Securities, LLC, and John Whelan are referred to herein collectively as the "Pelican Group Defendants."

On November 17, 2021, Pelican Group Defendants filed a Motion to Dismiss for Failure to State a Claim/Lack of Jurisdiction. (ECF No. 61; the "Pelican Group Motion.")  On the same day, the University of Mary filed a Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim.  (ECF No. 62; the "University of Mary Motion.")

On June 23, 2022, the court issued a memorandum opinion and order denying the Pelican Group Motion as to Counts I and II, and granting it as to Counts III through VI; and granting the University of Mary Motion in its entirety.  On July 7, 2022, Plaintiff timely filed its Motion for Reconsideration directed at the court's dismissal of Count III (Fraud/Civil Conspiracy/Aiding and Abetting against the Pelican Group Defendants and University of Mary).

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  FED. R. CIV. P. 54(b).  *See also Fayetteville Inv'rs v. Commercial Builders, Inc.,* 936 F.2d 1462 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); and Local Rule 105.10 (permitting a motion for reconsideration within fourteen days of the subject order).  Reconsideration is appropriate "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice."  *Hutchinson v. Staton*, 994 F.2d 1076, 1083 (4th Cir. 1993).  The Motion for Reconsideration argues that the court's dismissal of Count III was an error of law.

## III.     ANALYSIS

Plaintiff argues that the rule set forth in *Heckrotte v Riddle,* 224 Md. 591 (1961), only applies to negligence claims and is therefore inapplicable to the fraud claim in Count III.  More

specifically, contrasting negligence with fraud, Plaintiff asserts that a fraud action does not require a duty be owed by the defendant to the plaintiff not to have made the misrepresentation or omission at issue, whereas negligence requires the demonstration of a duty of care owed by the defendant to the plaintiff. Alighting upon this supposed distinction, Plaintiff asserts that the court ought not have dismissed Count III based on application of the Heckrotte Rule.

A. **The Heckrotte Rule**

*Heckrotte* involved a written contract for the sale (and purchase) of a "parcel of land in Baltimore County and for the erection thereon by the seller-builder of a two-story house at and for the sum of $15,650, the property to be conveyed to the buyers when completed by a 'good and merchantable title.' The house having been erected, a conveyance of the property was made pursuant to the contract." 224 Md. at 593. The buyers later discovered the house had been built on the lot in violation of county zoning regulations and a restrictive clause in a preceding conveyance. *Id*. The buyers filed suit. The first count of the complaint sounded in contract: the buyers alleged that the defect was latent, not apparent, and therefore that the seller had failed to convey good and merchantable title. *Id*. The buyers' second count sounded in tort: the buyers realleged the lack of a good and merchantable title, and alleged further that "as a result of the carelessness and negligence" and "conduct and acts" of the seller-builder, the value of the lot and improvements had been severely damaged. *Id*. The buyers made no allegation of fraud or misrepresentation in either count. *Heckrotte,* 224 Md. at 593.

The question before the *Heckrotte* court "was whether the [complaint] states a cause of action, either in contract or in tort, for the failure of the seller-builder to properly place the house on the lot in accordance with the side-yard requirements of the county zoning regulations." *Id*. at 594. In creating what is now known as the "Heckrotte Rule," the court relied on the long-standing

legal principle that an action in tort must be independent of an action in contract. *Id.* at 595. "The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort. . . . For it is only when a breach of contract is also a violation of a duty imposed by law that the injured party has a choice of remedies." *Id.* at 595-96 (citing *Slacum v. Trust Co.,* 163 Md. 350 (1932).

Before setting forth the court's analysis of the Heckrotte Rule's application to Count III, a detour is necessary to address Plaintiff's argument that the rule is limited to negligence actions.

### 1. Is The Heckrotte Rule Limited to Negligence Actions?

Based on the premise that actions in fraud have "no duty or legal obligation elements," Plaintiff argues that the Heckrotte Rule "does not apply to an intentional misrepresentation claim regarding a fraudulent inducement to enter into a contract." (ECF No. 77-1, p. 3.) In support of this position, Plaintiff asserts: "Fourth Circuit precedent holds that the Heckrotte Rule is limited to negligence actions." (*Id.*) The court disagrees with all three of these statements, which is to say 1) actions in fraud are premised upon duty; 2) the Heckrotte Rule does apply to fraud; and 3) the Fourth Circuit has not held that the Heckrotte Rule is limited to negligence actions. Further, as examined below, Plaintiff's argument does not consider the foundational case on which the Heckrotte Rule is built or Maryland law on the role of duty in fraud-based actions generally.

#### a. Duty and Fraud Torts

Plaintiff posits: "there is no duty or legal obligation element in a Fraudulent Inducement Claim." (The Motion, ECF No. 77-1, pp. 3, 3 n.2 setting forth the elements of a claim for intentional misrepresentation.) Plaintiff's recitation of the pleading elements of the tort of intentional misrepresentation views the matter too narrowly.

> "'[M]ere non-disclosure of facts known to defendant without intent to deceive is not fraud and is not actionable under Maryland law unless there exists a separate duty of disclosure

4

> to plaintiff by defendant.' *Finch v. Hughes Aircraft Co.,* 57 Md. App. 190, 232, 469 A.2d 867, 888 (1984) (citation omitted). The Maryland Court of Special Appeals has said: 'A duty to disclose is typically predicated on a confidential or fiduciary relationship between two parties.' *Latty v. St. Joseph's Soc. of the Sacred Heart, Inc.,* 198 Md. App. 254, 271–72, 17 A.3d 155, 165 (2011). Additionally, although 'ordinarily when one owes no legal obligation to speak, mere silence is not actionable[,] ... if what is stated amounts to a 'partial and fragmentary' disclosure, that misleads because of its incompleteness, the 'legal situation is entirely changed'' and ''there is a duty to disclose the additional information necessary to prevent it from misleading the recipient.'' *Lubore v. RPM Assocs., Inc.,* 109 Md. App. 312, 330–31, 674 A.2d 547, 556 (1996) (citations omitted); *accord Doll v. Ford Motor Co.,* 814 F.Supp.2d 526, 537 (D.Md.2011)."

*200 North Gilmor, LLC v Capital One, Nat. Ass'n*, 863 F. Supp.2d 480, 494 (D. Md. 2012); *accord Chiarella v. U.S.,* 445 U.S. 222, 227-28 (1980) (explaining that "[a]t common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 327 (1981) (explaining in the context of an intentional tort action that "in the absence of a legal duty owed by the defendant to the plaintiff . . . there can be no recovery in tort"); *see generally* 21 MD. LAW ENCYC., TORTS § 3, *Elements of tort, generally* (Aug. 2022 update) ("In order to constitute a tort, there must be a duty in favor of the person injured and on the person whose conduct produces the injury, conduct constituting a breach of such duty, and damages resulting from the breach of duty.")

In sum, in Maryland, fraud on the basis of a failure to disclose is rooted in a duty, which customarily arises from a fiduciary or confidential relationship; alternatively, absent such a relationship, where the failure to disclose would materially alter the import of the disclosure (a material omission), a duty arises on the part of the speaker not to deceive by way of such an omission (or misrepresentation). *200 North Gilmor, LLC, supra; Cf. Sass v. Andrew*, 152 Md.

5

App. 406, 431-32 (2003) (instructing that fraudulent inducement, fraudulent misrepresentation and fraudulent omission/concealment are all forms or "subspecies of fraud."). Either way, absent a duty, there is no fraud.

Here, Count III of the Amended Complaint alleges that Defendants provided financial statements and two letter agreements (December and February 2015 Letter Agreements) that omitted important information regarding the Pelican Group's financial status, relationships and debts, and that had Plaintiff known the truth, it would not have entered the Loan Agreement to loan the Pelican Group money. (Amended Complaint, ECF No. 16 at ¶ 159, pp. 45-46.) In short, Plaintiff alleges that it was induced by Defendants' failure to disclose what Plaintiff alleges was key information regarding the Pelican Group's financial status. Count III, therefore, is rooted in the alleged existence of a duty that Defendants bore to tell the whole story and not to withhold information the absence of which painted a different reality.

### b.     Fourth Circuit Authority

Plaintiff asserts "Fourth Circuit precedent holds the *Heckrotte* Rule is limited to negligence." (ECF No. 77-1, p. 3.) None of the cases to which Plaintiff cites so holds.[2] Plaintiff cites two District of Maryland cases[3] each of which cites *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292 (4th Cir. 2002). In *Lawyers Title,* a title insurer sued its agent for negligence and breach of contract. The court held that because Maryland has long recognized an independent duty of care owed by an insurance agent to its principal, an action in negligence could co-exist with a breach of contract action because the agent's duty of care is independent of the title

---

[2] Perhaps acknowledging that this is somewhat an overstatement, Plaintiff's citations to supporting authority begin with the Bluebook Introductory Signal *see,* which, according to the 21st edition of the Bluebook, is used "when the proposition is not directly stated by the cited authority but obviously follows from it." The court disagrees that any case Plaintiff cites holds that the Heckrotte Rule is limited to negligence or that this statement "obviously follows" from the holding of any case Plaintiff cites.

[3] *Swedish Civil Aviation Admin. v. Project Mgmt. Enters.,* 190 F. Supp.2d 785 (D. Md. 2002), and *Nat. Prod. Sols., LLC v. Vitaquest Int'l,* LLC, No. CCB-13-436, 2013 U.S. Dist. LEXIS 87969 (D. Md. June 24, 2013).

insurance contract. Therefore, the court held, the case presented one of the "few narrow exceptions" to the Heckrotte Rule (which otherwise would have barred the negligence action). 282 F.3d 293-94. The Fourth Circuit has not held that the Heckrotte Rule is limited to negligence.

### c.  *Slacum v. Eastern Shore Trust Co.*, 163 Md. 350 (1932)

The *Heckrotte* court relied on the case of *Slacum v. Eastern Shore Trust Co.* in support of its holding that "only when a breach of contract is also a violation of a duty imposed by law that the injured party has a choices of remedies." *Heckrotte v. Riddle*, 224 Md. 591 (1960) (citing *Slacum v. Eastern Shore Trust Co.,* 163 Md. 350 (1932)).

*Slacum* dealt with fraud, not negligence, as the tort in question. *Heckrotte,* 224 Md. at 595-96. In *Slacum,* the defendant induced the plaintiff into purchasing a note the defendant had signed by falsely stating that his wife had also signed the note; in fact, she had not. 163 Md. at 352. The court held the plaintiff could sue in tort or contract, but not both:

> "The theory of the appellant is that the appropriate remedy of the appellee would be in assumpsit. The appellee could have sued in assumpsit, but it had its choice either so to sue on the promissory note or in trespass on the case for deceit, and it chose to do the latter. Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract."

*Id.* at 352-53 (citations omitted).

### d.  *Wilmington Trust Co. v. Clark*, 289 Md. 313 (1981)

Also helpful is *Wilmington Trust Co. v. Clark*, 289 Md. 313 (1981) (Murphy, C.J., writing for the court). There, Mrs. Clark, the ex-wife of decedent Mr. Clark, brought suit against Mr. Clark's estate's personal representative (Wilmington Trust) on grounds that when Mr. Clark committed suicide, he "wrongful[ly] and tortious[ly] deprived" Mrs. Clark of her entitlement to alimony as set forth in their separation agreement. 289 Md. at 316, 321 n.5 ("For the purposes of

Case 1:20-cv-02802-JRR   Document 81   Filed 11/08/22   Page 8 of 13

this decision, we shall assume without deciding that suicide is a criminal or unlawful act in both Delaware and Maryland."). Mrs. Clark also sued in contract, contending that by voluntarily prematurely ending his own life, Mr. Clark broke his contractual promise to continue to pay alimony; and while Mrs. Clark may have assumed the risk of accidental death and the like, she "did not agree to a lessening of her expectations because of a voluntary act of decedent." *Id.* at 317.

The Court of Appeals affirmed the trial court's sustaining of the demurrer to the contract action for reasons not relevant here, and then turned to examine the trial court's award of damages on the merits of the tort action. Summarizing Mrs. Clark's tort argument, Chief Judge Murphy wrote:

> "Ruth argues that the lower court's recognition of suicide as an intentional tort is supported by the common law. She contends that John's suicide was a wrongful act which adversely affected her right to receive alimony and support payments under the separation agreement. She suggests that the duty owed to her by John was the common law duty of a husband to support his wife, which was transformed into a contractual duty of support by the separation agreement. Finally, Ruth argues that the tort committed by John was intentional interference with contractual rights."
>
> .   .   .
>
> There is no merit to Ruth's argument that the duty owed to her by her former spouse was a common law duty of support, transformed into a contractual duty of support by the separation agreement. While a tort action in favor of a contracting party can be founded upon a duty arising out of the contractual relationship, *see Wedeman v. City Chevrolet Co.*, 278 Md. 524, 366 A.2d 7 (1976), the duty giving rise to the tort cause of action must be independent of the contractual obligation. *Heckrotte v. Riddle*, 224 Md. 591, 168 A.2d 879 (1961); *see Matyas v. Suburban Trust Co.*, 257 Md. 339, 263 A.2d 16 (1970). By suggesting that the common law duty of support was transformed into a contractual duty, Ruth has, in effect, conceded that her alleged tort cause of action is actually an action for breach of contract. Mere failure to perform a contractual duty, without more, is not an actionable tort. *Heckrotte, supra*. Thus, neither Ruth nor the trial court identified a viable tort duty owed by John to Ruth.

*Wilmington Trust Co.*, 289 Md. at 318-19, 327-29.

Thus the *Wilmington Trust* court held that even if Mr. Clark did owe Mrs. Clark a

common law duty of continued support separate and apart from their contract, any "common law duty of [spousal] support . . . was transformed into a contractual duty." And, therefore, Mrs. Clark's "alleged tort cause of action is actually an action for breach of contract." *Wilmington Trust Co.*, 289 Md. at 328-29.

### B. The Loan Agreement is the Basis of Counts II and III

Plaintiff's claim for breach of contract (Count II) alleges breaches of the Representations and Warranties contained in the Loan Agreement. Plaintiff's Count III is based on precisely the same alleged misconduct – breaches of the Representations and Warranties set forth in the Loan Agreement.

| COUNT II | COUNT III |
|---|---|
| In the Loan Agreement Mr. Ferguson and the Pelican Group represented and warranted to Aqua that information Aqua received in connection with negotiating the loan: (1) did not contain any material misstatement of fact; (2) did not omit a material fact; and (3) did not omit any fact necessary to make the statement contained therein not materially misleading (collectively referred to as the "Representations and Warranties"). <br><br>(ECF No. 16, ¶ 149.) | Mr. Ferguson individually and in his capacity and as an officer, director and/or shareholder of the Pelican Group made material representations of fact to Aqua that the Financial Statements, the December 2015 Letter Agreement the February 2015 Letter Agreement provided to Aqua in connection with the negotiation of the Aqua loans: (1) did not contain any material misstatement of fact; (2) did not omit a material fact; and (3) did not omit any fact necessary to make the statement contained therein not materially misleading ("the Representations") <br><br>(ECF No. 16, ¶ 158.) |
| The Representations and Warranties were false, omitted material facts and were materially misleading at the time the Pelican Group and Mr. Ferguson executed the Loan Agreement. In particular, the Financial Statements [Exhibits 7 and 8] failed to disclose debts owed in the OFK Secret Liability Account. The December, 2015 Letter Agreement: (1) failed to disclose that that the University of Mary had already paid the amounts identified in the February 2015 Letter Agreement (2) misrepresented to Aqua that the | The Representations were false, omitted material facts and were materially misleading at the time the Pelican Group and Mr. Ferguson executed the Loan Agreement. In particular, the Financial Statements failed to contain debts in the OFK Secret Liability Account. The December 2015 Letter Agreement: (1) failed to disclose that that the University of Mary had already paid the amounts identified Case 1:20-cv-02802-JRR Document 16 Filed 12/09/20 Page 45 of 60 46 in the February 2015 Letter Agreement; (2) misrepresented to Aqua that |

| | |
|---|---|
| 7 Million Dollar Option had not been exercised and (3) failed to disclose that the University of Mary had already paid the Pelican Group 7 Million Dollars for the Option.<br><br>(ECF No. 16, ¶ 150.) | the 7 Million Dollar Option had not been exercised; and (3) failed to disclose that the University of Mary had already paid the Pelican Group 7 Million Dollars for the Option.<br><br>(ECF No. 16, ¶ 159.) |
| At the time Mr. Ferguson and the Pelican Group executed the Loan Agreement Mr. Ferguson knew: (1) that the University of Mary had exercised and paid the Pelican Group for the 7 Million Dollar Option; (2) that the University of Mary had paid the 10 Million Dollar Agreement in full, and (3) that the Pelican Group concealed from Aqua the OFK Secret Liability Account with more than ten million dollars in liabilities.<br><br>(ECF No. 16, ¶ 151.) | Mr. Ferguson and the Pelican Group knew the Representations were false and/or made with reckless indifference as to the truth thereof.<br><br>(ECF No. 16, ¶ 160.) |
| In making its decision to loan $800,000.00 to the Pelican Group, Aqua relied on (1) the Financial Documents which omitted the OFK Secret Liability Account; and (2) the 2015 Letter Agreements and the Loan Agreement which represented the continuing existence of $121,556.56 per month revenue stream from the University of Mary and represented that University of Mary had not exercised or paid for the 7 Million Dollar Option.<br><br>(ECF No. 16, ¶ 152.) | The Plaintiff justifiably relied on the Representations and loaned the Pelican Group $800,000.00 identified in Note I and Note II. Plaintiff's reliance is evidenced by: (1) Plaintiff taking a security interest in (a) the 7 Million Dollar Option Agreement; and (b) the payment stream identified in the February 2015 Letter Agreement and the December 2015 Letter Agreement; and (2) the Plaintiff lending the Pelican Group $800,000.00.<br><br>(ECF No. 16, ¶ 162.) |
| Aqua would not have loaned the $800,000.00 to the Pelican Group had Aqua known that any one of these material facts were false.<br><br>(ECF No. 16, ¶ 153.) | Aqua would not have loaned the $800,000.00 to the Pelican Group had Aqua known that any one of these material facts were false. The Representations were false, omitted material facts and were materially misleading at the time the Pelican Group and Mr. Ferguson executed the Loan Agreement.<br><br>(ECF No. 16, ¶ 163.) |
| WHEREFORE, Aqua requests Judgment in favor of Aqua and against Mr. Ferguson for the the following sums and for other just and proper relief: Principal Amount: 685,342.29 Accrued Interest to September 15, 2020 | WHEREFORE, Aqua requests Judgment in favor of Aqua and against the Defendants, The University of Mary, the Pelican Group, Frank Ferguson, Patrick O'Meara, and John Whelan for the the [sic] following sums in |

| | |
|---|---|
| 401,039.46 Total Principal and Interest $1,086,381.75 Plus, attorney's fees and costs and interest accruing at the rate of $342.67 dollars per day.<br><br>(ECF No. 16, p. 44.) | compensatory damages: Principal Amount: 685,342.29 Accrued Interest to September 15, 2020 401,039.46 Total Principal and Interest $1,086,381.75 Plus, attorney's fees and costs and interest accruing at the rate of $342.67 dollars per day, punitive damages in the amount of $1,000,000.00 and for other just and proper relief.<br><br>(ECF No. 16, pp. 51-52.) |

Critically, "Default" as defined by the Loan Agreement, encompasses all alleged material misstatements and omissions on which Plaintiff bases Count III:

The Loan Agreement at Section 8.01. Events of Default provides:

> If any of the following events shall occur:
> (2) Any representation or warranty made or deemed made by the Borrower in this Agreement, or which is contained in any certificate, document, opinion, or financial or other statement furnished at any time under or in connection with any Loan Document shall prove to have been incorrect, incomplete, or misleading in any material respect on or as of the date made or deemed made;

(ECF No. 16-1, p. 14.)

The 2015 Notes provide:

> (5) *Events of Default and Remedies.* At the option of the holder of this Note, the entire unpaid principal balance of, and all accrued interest on, this Note shall immediately become due and payable upon the occurrence at any time of any one or more of the following (herein referred to as an "Event of Default"):
>
> a) Borrower shall fail to pay the principal of or interest on this Note as and when the same becomes due and payable in accordance with the terms hereof, and such failure shall continue for a period of fifteen (15) days after receipt of written notice from Lender specifying such failure, provided, however, that Lender shall be obligated to give only one (1) such notice in any calendar year and, after the giving of such one notice, Lender shall be entitled to exercise its remedies upon any subsequent default occurring within such calendar year without any requirement of notice; or

> b) Borrower shall fail to perform any other covenant, condition, obligation or agreement set forth in this Note, the Term Loan and Security Agreement dated as of January 29, 2016 by and between the Lender and the Borrower (the "Loan Agreement") or any other agreement relating to the loan evidenced by this Note (a "Loan Document"), other than as set forth in paragraph 5(a) above.
>
> If an Event of Default shall occur, Lender may (a) declare the entire balance of this Note, principal and interest, immediately due and payable; (b) exercise any rights under the Loan Agreement or any other right contained in any other Loan Document; and (c) exercise any other remedy provided by law or equity. No remedy referred to herein is intended to be exclusive, but each shall be cumulative, and the exercise or beginning of exercise by Lender of any one or more of such remedies should not preclude the simultaneous or later exercise of any or all of such remedies. Any failure of Lender to exercise any rights or remedies available to Lender if an Event of Default should occur shall not constitute a waiver of Lender's right to exercise such rights or remedies in the event of any subsequent Event of Default.

(ECF Nos. 16-2 and 16-3, p. 6.)

Also of note, the requested relief in the *Ad Damnum* section of Count III is based exclusively on the Loan Agreement and Notes: the principal amount owed under the Loan Agreement and Notes in the amount of $685,342.29; the interest owed allowable under the Loan Agreement and Notes in the amount of 401,039.46 as of September 15, 2020, and accruing at a rate of $342.67 per day; and attorney's fees provided for in the Loan Agreement at Section 14(b). (ECF No. 16-1, p. 16.) Thus the alleged injury Plaintiff sustained under Count III for fraud is solely and exclusively the result of Defendants' alleged breach of contract set forth at Count II. Plaintiff alleges no fraudulent acts or omissions by Defendants that are not covered by the terms of the Loan Agreement or Notes; nor does it allege any injury unaccounted for by the Loan Agreement.

The essence of the parties' relationship is contractual, and the "basis for the claim of defendant's dereliction is its failure to perform the contract" in the form of non-payment and

alleged false representations during the contract negotiations, both of which qualify as Events of Default under the Loan Agreement. *ABT Assocs. v. JHPIEGO Co.,* 104 F. Supp. 2d 523, 537 (2000) (citing *Baird v. C&P Tel. Co. of Baltimore*, 208 Md. 245, 258-59 (1955)) (holding that "[w]here the essence of a relationship between the parties is contractual in nature and the basis for the claim of defendant's dereliction is its failure to perform the contract, the cause of action arising from such dereliction is not available in a tort action but only in an action for breach of contract."). By suing in both contract and in tort for alleged wrongs that are codified in the contract, Plaintiff converted whatever tort duty it may have been entitled to sue on, if any, into an action in contract. Plaintiff may not pursue both actions. *Wilmington Trust Co. v. Clark*, 289 Md. 313 (1981); *Heckrotte v Riddle,* 224 Md. 591 (1961); *Slacum v. Eastern Shore Trust Co*., 163 Md. 350 (1932).

### C.   Aiding and Abetting

Plaintiff argues that the court should reinstate the aiding and abetting fraud portion of Count III as against Mr. Whelan and the University of Mary. In view of the court's conclusion that it did not commit an error of law in dismissing the fraud portion of Count III, the court's ruling with respect to aiding and abetting remains intact.

### IV.   CONCLUSION

For the reasons set forth herein, by separate order, the Motion for Reconsideration will be denied.

/s/
Julie R. Rubin
United States District Court Judge

November 8, 2022

13